Kenneth C. Davis, et al. [1] v. Commissioner. Davis v. Commissioner
Docket Nos. 49430-49432.
United States Tax Court
T.C. Memo 1956-166; 1956 Tax Ct. Memo LEXIS 127; 15 T.C.M. (CCH) 879; T.C.M. (RIA) 56166; July 16, 1956
*127 William J. Duiker, Esq., Southern Building, Washington, D.C., for the petitioners. John H. Welch, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner has determined deficiencies in income tax against petitioner and his wife as follows: Year
Deficiency
Kenneth C. Davis
1946
$ 910.77
1947
1,124.08
Kenneth C. Davis and Pauline
W. Davis
1948
21,375.82
Pauline W. Davis
1946
910.77
1947
1,000.58
The two issues for our determination are (1) whether the respondent has erred in including in the gross income of Kenneth C. Davis, an attorney, for the years 1947 and 1948 the sums of $25,000 and $35,000 paid in those years, respectively, by his client directly to the holder of a real estate and chattel mortgage wherein petitioner was the sole mortgagor and (2) whether respondent has properly disallowed deductions taken by Kenneth C. Davis for the years 1946, 1947 and 1948 for his proportional part of the losses of joint ventures of which he was a member. General Findings of Fact Petitioners are Kenneth C. Davis and Pauline W. Davis, who are individuals, husband and wife, residing *128 at 2002 36th Avenue West, Seattle, Washington. They filed separate individual income tax returns with the collector of internal revenue for the district of Washington for the taxable years 1946 and 1947, and various amended returns, reporting on a community-property basis. They filed joint income tax returns, both an original and an amended return for 1948, with the collector of internal revenue for the district of Washington. As all the transactions herein involve the activity of Kenneth C. Davis, and Pauline W. Davis is a party to the proceedings because of the community-property character of the interests created, reference to "petitioner" will mean Kenneth C. Davis. Issue 1. Payments Made by Client Findings of Fact Petitioner is an attorney. In May of 1944 at a price of $150,000 he purchased a tract of land comprising about 10 square miles situated in Montana, hereinafter sometimes referred to as the Montana property, and certain personal property located thereon. He made a down payment of $25,000 on the purchase price at the date of purchase and executed five identical promissory notes to the seller of the property, each in the amount of $25,000, the first being due and *129 payable in May of 1945 and subsequent notes were due and payable at yearly intervals until the full purchase price had been paid. The deferred balance was secured by a purchase money mortgage upon the real estate and a chattel mortgage upon the personal property located on the premises on the date of purchase. Petitioner was the sole mortgagor as to both mortgages. He received a deed to the real estate conveying title thereto to him personally. Title to the personalty was likewise vested in him personally by virtue of a bill of sale executed by the seller. The real estate and personal property consisted of timber land, pasture land, creek beds, water rights, several dwellings, some mining machinery and equipment, and a gold mining dredge which was partially dismantled and in a state of disrepair but which still consisted of a number of valuable parts. Prior to, and at the time of, the entry of the United States into World War II, the petitioner's grantor, Pioneer Placer Dredging Company, conducted a placer gold mining operation on part of the Montana property. Due to governmental wartime restrictions the operation was discontinued upon the entry of the United States into the war. *130 The down payment made by petitioner was made largely from funds borrowed by him from J. Elroy McCaw. In 1945 McCaw elected to treat the loan as an investment and entered into a joint-venture agreement with petitioner. Pursuant thereto petitioner deeded to him a one-half interest in the real estate referred to above. On or about their due dates McCaw also paid the first and second mortgage notes in 1945 and in 1946, respectively, which payments were also treated as an investment by him and the petitioner. When the 1947 note became due and payable, petitioner was practicing law in Washington, D.C., in an effort to obtain sufficient funds to finance the remaining balance due on the purchase price of the Montana property and to operate it as a placer mine and generally exploit its mineral potential. Donald P. Lallemant in 1947, when the mortgage note due in that year was in default and foreclosure of the mortgage threatened, asked petitioner to represent him in connection with a business matter which, it was calculated, would consume much of petitioner's time until brought to a conclusion. Petitioner was reluctant to represent Lallemant because of the threatened foreclosure. Lallemant *131 agreed to pay the entire balance of the mortgage should petitioner take over the representation of Lallemant and be successful therein. Upon the mortgagee's consent to granting additional time before instituting foreclosure proceedings, petitioner agreed to pay the entire balance due on the mortgage at the expiration of the extended time. He was successful in his representation of Lallemant who, in accordance with his agreement, paid the balance due on the mortgage, which balance through negotiation was reduced from $75,000 to $60,000. This payment was made by Lallemant directly to the mortgagee or its representative by two checks, one for $25,000 delivered in October 1947 and the other for $35,000 delivered in January 1948. Petitioner was not the payee in either check. In return petitioner received from the mortgagee a full and complete release of both the real estate and chattel mortgages. Lallemant had become interested in acquiring membership in the joint venture and on April 26, 1948, entered into a new joint-venture agreement with petitioner and McCaw, wherein he agreed to purchase a one-third interest in the venture at a price of $240,000, the $60,000 theretofore paid by him *132 to retire the mortgages above mentioned to be applied on the purchase price. In connection with the foregoing agreement petitioner and McCaw, prior to or about April 26, 1948, deeded an undivided one-third interest in the real property here involved to Lallemant. During the period when petitioner was representing Lallemant as attorney and negotiating with him in connection with his becoming a member of the joint venture, petitioner had endorsed a $37,500 note in which Lallemant was the principal obligor. To secure petitioner in so doing, Lallemant, after execution of the new joint-venture agreement, executed and delivered to petitioner a deed to his interest in the Montana real estate here involved. The deed was not immediately recorded by petitioner, but was held by him unrecorded until on or about June 18, 1949, when it was apparent Lallemant could not or would not pay the balance of the purchase price agreed to by him for an undivided one-third interest in the joint venture. On or about that date petitioner recorded the deed, thus vesting in him an undivided two-thirds interest in the Montana realty. Lallemant has not since made a claim to an interest in the joint venture or such *133 real property. Neither petitioner in their separate or joint returns for the tax years at issue included as income any part of the $60,000 amount paid by Lallemant to the mortgagee of the Montana property on grounds stated in returns and amended returns for 1947 and 1948 that such payments were considered to constitute a potential investment for the purpose of the acquisition by him of a one-third interest in the joint venture. In his deficiency notice the Commissioner has included the two payments of $25,000 and $35,000 in gross income for the respective years in which such payments were made. Opinion Petitioners take the position that the two payments of $25,000 in 1947 and $35,000 in 1948 made by Lallemant directly to the mortgagee of the Montana property were during each of those years investments by him in a joint venture by virtue of the joint-venture agreement executed by him with petitioner and McCaw April 26, 1948; that although his subsequent default of that agreement for failure to make any further payments thereunder changed the character of the payments made by him upon the mortgage from an investment to compensation to petitioner, nevertheless, such payments having *134 been made to retire an encumbrance on property belonging not to petitioner alone but to all members of the joint venture, such payments were income to petitioner only in proportion to his interest in the venture during the respective tax years in which the payments were made. Respondent contends the $60,000 paid on the mortgage by Lallemant was simply compensation for services rendered to him by petitioner and chargeable to him as taxable income. We think it clear the respondent is correct. There is no dispute concerning the genesis of Lallemant's payments. They were made by him not only on the basis of services rendered to him by petitioner, but also were directly contingent upon the successful result of those services. That they were made directly to petitioner's mortgage creditor in lieu of first coming into his physical possession is of no moment. When applied to his personal liability on the real and chattel mortgages, they became compensation to him and thus constitute taxable income. , certiorari denied ; ; . *135 Decision on this issue is for respondent. Issue 2. Deductions Disallowed Findings of Fact The governmental wartime restrictions on gold mining which had caused the petitioner's grantor to discontinue its gold mining operation on part of the Montana property still were in effect at the time the petitioner purchased the property in 1944 and continued in effect until after the cessation of hostilities with Japan in 1945. Because of a lack of funds and their resulting inability to obtain the necessary equipment, materials, and labor, the joint ventures were unable to, and, consequently, did not attempt to, conduct any mining operations on the property during the years 1946 through 1948. In that situation and in order to realize as much income as otherwise was obtainable from the property for its management, maintenance, and upkeep, the ventures leased some of the land to local farmers for grazing purposes, rented some of the dwellings, and sold some timber that was on the property. The entire income for the years in question was from those sources. During the years 1946 through 1948 the joint ventures, in addition to making expenditures for taxes, interest and insurance, made *136 expenditures for the maintenance of ditches, fences, dwellings and equipment, and for watchmen for the dredge and other equipment. The ventures also paid the telephone, telegraph and traveling expenses incurred by petitioner and McCaw in connection with the affairs of the ventures. Some legal expenses were paid for the removal of squatters from the property. Some expenditures also were made for testing mineral from portions of the land in order to maintain the mineral rights in the land, but, aside from enabling the ventures to maintain such rights, the testings produced no useful results. None of the expenditures for any of the years were for improvements. All of the expenditures were for the management, conservation, or maintenance of the property and none of them in any of the years increased the value of the property. For each of the years in question the expenditures made by the ventures were in excess of the income received therefrom for such years and the partnership returns of income filed by the ventures for the respective years disclosed losses. The petitioner deducted in his income tax returns for such years his proportional parts of such losses. The respondent disallowed *137 such deductions on the ground that during the years in controversy the property was not in a mine-producing status but was in the development stage and therefore all expenses of the ventures in excess of their receipts were to be capitalized. Opinion The respondent takes the position that during the years here involved the Montana property, which admittedly in those years produced no mineral, was in the development stage and that his disallowances of the deductions in question should be sustained. In support of his position he relies on , and , affirming . The petitioner contends that the expenditures of the syndicates were not made for the development of any mine or mineral property but were made solely for the management, conservation and maintenance of the Montana property and the personal property thereon and the deductions taken by him should be allowed. , decided since the respondent filed his brief, reversed our decision therein. Consequently, our decision there does *138 not aid respondent here. In the Guanacevi case, the question was as to the deductibility as operating expenses of the cost of driving two new tunnels into known bodies of ore which previously had been worked near the surface but in which production had been suspended because the previously developed high grade ore had been exhausted and the driving of the two new tunnels was essential and necessary to the subsequent mining of the remaining low grade ore, which a survey had indicated could be mined at a profit. Substantial quantities of ore were produced by the taxpayer in each of the taxable years involved. In holding that the cost of the tunnels was development expenses and was to be capitalized the court said: "The tunnels made available these ores which were theretofore inaccessible. It follows that the expenditures in question were made for the purpose of attaining an output, not of maintaining an output, and were, therefore, 'development' expenses, properly chargeable to capital, to be recovered through depletion deductions. * * *" Because of the factual differences we fail to see the applicability of the Guanacevi case here. From the time the petitioner's grantor discontinued *139 its mining operations on the Montana property, due to governmental wartime restrictions, until through 1948, neither it nor the petitioner nor the joint ventures did any work directed to the development or mining of ore. Neither petitioner nor the ventures were able to do so because of lack of funds. As we view the situation here presented, the ventures during the years 1946 through 1948 were engaged merely in a holding operation, in which they were managing, conserving and maintaining the property as best they could against the time, if it ever occurred, when they could obtain funds with which to begin the development and exploitation of the mineral on the property. None of the expenditures made by the ventures were for improvements and none of them in any of the years increased the value of the property. We have found that the expenditures in controversy were for the management, conservation, or maintenance of the property. Since they were for such purposes, they were deductible. Respondent makes no claim that any of such expenditures were unreasonable in amount. Accordingly, the petitioner's proportionate share of the losses of the ventures for the respective years in question *140 were allowable deductions. Decisions will be entered under Rule 50 Footnotes
1. The proceedings of the following petitioners are consolidated herewith: KENNETH C. DAVIS and PAULINE W. DAVIS, Docket No. 49431, and PAULINE W. DAVIS, Docket No. 49432.↩